May it please the court we are asking that the convictions in this case be reversed and the case remanded because the government failed to disclose that one of their most important witnesses was a paid informant for multiple law enforcement agencies at the trial in our case in 2006 Victor Bulgarian testified as a witness who didn't have any stake in the case whatsoever he was not receiving any benefits he had he had a previous case from 2004 that he'd already been sentenced on so he wasn't there that case was done he wasn't testifying in the hopes that he would get benefits in terms of that cooperation in essence the jury was left with the impression that mr. Bulgarian was coming forward as a good citizen to testify against the violent boys and especially to establish their connection with the Mexican mafia it did come out I can interrupt you for a moment counsel it I don't know what the Brady violation is can you please tell me that and then I'm going to follow that up with questions about the fact that we're being asked to analyze whether there's a Brady violation here via request for judicial notice on facts that appear to be disputed so let me get back to my initial question of what is the Brady violation here other than the failure which the prosecutor admitted to failing to disclose the $5,000 that was admitted on cross-examination the Brady violation is that Victor Bulgarian was operating as a paid informant that he was he was not just a good citizen coming forward he was actually earning lots of money as an informant he was cooperating with the DEA the Bureau of Narcotics Enforcement the ATF the FBI and he testified at the later trial that he had received over $100,000 that is completely different than the $5,000 relocation cost which the government argued was the least they could do since he was coming forward as a good citizen to testify against finally boys he was in great danger they needed to do that in order to make sure that he was kept safe but what was really going on at that time was that he was actually receiving money for his testimony and his cooperation we know at at our trial he testified that the first time he met with law enforcement about the Vineland boys was after he'd already been sentenced in that 2004 case so at that point there was no reason for him to continue cooperating the sense that the jury was left with was that he was doing this because he was a good guy and he wanted to see these guys behind bars but he didn't he didn't have any stake in the outcome of this case and that turned out not to be true at all okay if I can slow you down one minute and I just want to make sure I understand the record that the defense is relying on to allege a Brady violation in this case you're saying that at the time that he testified in this trial in 2006 he had already been working as an informant and the defense didn't know that and never got a chance to cross-examine him beyond the fact that he basically was cooperating and got $5,000 for relocation expenses right and the reason you know that he was a cooperator working for multiple agencies was because some years later he testified in a different trial and said that oh between 2004 and 2009 I got a whole bunch of money so the inference is that in 04 two years prior to the trial in this case he must have been working for various agencies because he said so some years later am I getting it right yes I mean I will the one thing I'll say just to add to that was that that he said he had been he was being paid that he says that he had started working on the Vineland boys case and that this money had been paid since 2004 he didn't qualify that as being since 2006 for example and we also know from the government's declaration that he's gotten to $200 payments from the ATF for time and $60 from the Santa Barbara Police Department for similar reimbursement which certainly indicates that he was working as an informant at that point and as you can see from the letter that or the filing and to the court that we included in the sealed excerpts of records the defense counsel was immediately suspicious even in 2006 about what was going on they were very concerned partly because a lot of what he testified to just didn't make sense based on what was already known about the Mexican Mafia but also because it just it didn't it didn't make any sense as to why he was testifying if he'd already been sentenced and it wasn't until after that that he sat down with law enforcement there wasn't any purpose for this cooperation and so that there was immediate suspicion about that and and the record really does even though there are some disputed facts the record really does show that he was working as a paid informant back in 2006 when he when that had not been disclosed. It's not entirely clear to me I think that there are some inferences that the defense is relying on given the suppose the AUSA's declaration was somewhat cursory and so I couldn't tell couldn't reconcile the AUSA's testimony and you know the way informants talk sometimes it's it's all muddled did you was there a reason why the defense chose not to raise these issues via 2255 so that the district court could sort it out? Well let me address that when we found out about this evidence it was 2009 so it's too late for us to file to file in the district court because we even even the newly discovered evidence rule 33 section three years had passed at that point and I'm sure if we'd filed at that point the government would have said it was not timely and I agree that the record is not entirely clear the government admits that the agency that he was most likely cooperating with back then was the BNE and that agency has since merged with another and they he was confused about who he was working with but it's in 2009 he testified that he was working with the BNE starting in 2004. So probably too late or possibly too late under rule 33 but 2255 would not be the appropriate vehicle? Well we certainly could go back after this case is done at this point we can't file at 2255 but we could certainly go back later on our clients won't be represented by counsel at that point and given that we have so much information just because he ended up testifying again we have some that we although there are some disputed facts we know that he was working as a paid informant back then. The first time you realized that you became aware of this the case was on appeal before us? Yes this is a 2007 case and and mr. 2007 appeal the trial was in 2006 but all we all have we have 07 appellate numbers so we had in fact we had been on this appeal for quite some time at the point that Horacio Llepiz went to trial he was a co-defendant in this case so we were very much aware and he's the brother of two of the the appellants in this case so that was you know it's part of the same case but three years later we have this very different testimony. And if we don't reverse on that basis your request is that we remand for development of the facts? Yes. And and a limited remand is it that you're requesting? Well we are our request is that the all of the counts be reversed and the case remanded because there is enough evidence. No I said if we don't do that then yes then it would be a remand on that issue as to what what benefits had not been turned over at the 2006 trial. I have a question does this affect everyone's conviction or how many convictions this is this would this affect? Yes so that goes to the prejudice problem we're asking that all of the convictions be reversed and the Is his testimony sufficiently prejudicial on every count? Yes so let me address that this was this case was a huge RICO case. Count two the RICO conspiracy had over 400 overt acts that ranged from small drug deals to murders there were five murders that had not been committed by any of the appellants that were that came into evidence sometimes in great detail and a lot of this a lot of the case really though was as as concerns our clients a drug case that's what the district court said he said this case has been grossly overcharged as a RICO case we've been in trial now for two months on what's basically a government charged it as a RICO case all of these other prejudicial acts came in and so that that what Victor Bulgarian's testimony really went to the heart of their case he was the one who said the violent boys is an entity they have a ruler they have tentacles that go up to the Mexican mafia they have these drugs he testified his testimony is not only about the enterprise but also about the drug sales that the gang made the government theory was that the gang could only sell drugs because of the enterprise the protection of the enterprise but this was a wire case so the government had been up on a wire for quite some time multiple phones and that was the bulk of the evidence when when you try a RICO wiretap case it's conversations testimony regarding which phones were were tapped whose phones that belong to agents drawing the lines between different pieces of circumstantial evidence lot defendants on the wire themselves admitting to criminal conduct so then in order to reverse that we have to kind of tease through that to see whether this one informant testimony really to the extent of the corroboration and whether the result would have been any different in light of all the other evidence that the government presented well it's true that I I I'm not able to hear representing Rafael Yates in particular but to go through every single drug count that was charged because it certainly was a huge case I will say you're absolutely right a lot of the evidence was wiretap and frequently there would be conversations about three three motors and the government then would come forward and say well when they're saying three motors that means three kilos and Mr. Bulgarian's testimony went to that as well because he was the one who talked about the amount of taxes the amount that that the violent boys would need to pay to the Mexican mafia and so that also went to the drug quantity now in certain cases in it in some cases there were seizures but not in all and my client for example got a life sentence on drugs that were not recovered that were based on what the agent then said he was talking about there were some drugs recovered but what got him over that mandatory minimum amount was based on the agent later interpretation of what it was that he was talking about but Victor Bulgarian was the guy on the ground who could say this was the price I think the government started by asking about the price per pound of methamphetamine and well they had a government expert testifying about street price too I'm assuming they did they did although presumably also some of his conclusions were based on Mr. Bulgarian's evidence which from the beginning was very I mean just his veracity was as you can tell from the defense lawyers filing there was great concern about what he was testifying to he testified that he was the right-hand man to a Mexican mafia leader and yet he'd never met that leader he testified that that he had the keys to a prison even though he'd never been to prison he didn't have any any record and so and if counsel and I'm sorry I'm interrupting you again because I know time is very short on this issue but if we are unclear as to whether a Brady violation even occurred why should it be reversal across the board and a remand instead of an affirmance without prejudice for you to sort this out in the district court well I certainly hope that any affirmance would be without prejudice because we would absolutely want to raise this in a 2255 and I will just point out that we won't there won't be lawyers in that 225 proceeding which is one of the big problems with these and frequently the defendants are not represented at that point and so we actually we are in the unusual position that we found out about this evidence partly because it was just the testimony was so upsetting at the time to trial lawyers to the trial lawyers and that the trial lawyer in Horacio Yeviz's case contacted us we contacted him for him to say look Bulgarians an informant which was not he you know he was familiar with those transcripts and that had not been turned over we better leave you to possible rebuttal have you shown that exhibit to your opposing counsel I have your honor and the clerk asked before I begin my comments did I make sure that this panel has approved my use of this exhibit just for clarification during my when it comes up during my arguments and especially since one of the panel members was not here so I will follow your guidelines government counsel has graciously agreed that she has no objection all right all right thank you and please the court I am Donald Randolph and I represented mr. Mesa during these proceedings I was trial counsel in 2006 this morning I would like to amplify two critical points on voir dire frankly until I reread the transcripts said within the last few days of the seven days of voir dire I didn't clearly remember nor appreciate the significance of parts of the record hopefully you will indulge me now since the last time I read these transcripts was over eight years ago when I was still a young man here we are today and I'm trying to address these facts in time permitting miss we fault who's present the council table will address the case law we've split up the arguments facts from me and case law from his we fault as a court notice from the briefs voir dire of over 200 prospective jurors took place over approximately seven days two-thirds of that voir dire was outside the presence of the defendants and of the public from the outset I objected to the process that the defendants were being excluded from being present these objections were raised again several times during voir dire now the two key points that I got from the transcripts which I'd like to present to this court this morning are first I personally requested that the court adopt a procedure that would accommodate the defendants and the public during voir dire and the trial court summarily denied this request without discussion and second in the alternative proposal that was submitted to the court I didn't see from the record that any anybody really spoke up and said well here's an alternative that's viable given the security concerns the size of the case the logistical courtroom set up did I miss something in the record well it's the reason you didn't actually miss it your honor the when I made my proposal it was summarily dismissed without without discussion and so let me then part of what I really want to do today is walk through that proposal so this court understands what was contained in that proposal even though it was summarily dismissed by the trial court now on the first day mr. Mesa I on his behalf I objected to the procedure at that point but when the first prospective juror of many had been briefly questioned in shame in the jury room with all the attorneys and none of the defendants it was clear that the court intended to conduct not just some hardship questions in the jury room but all of the cause of all of the voir dire for cause and without inquiring first even whether a prospective juror wanted to discuss things in private my objection was overruled and the voir dire proceeded apace on day three your honor that's when we got to my proposal and the gentleman let me set the stage for you if I can in open court you have the defendants all nine of them sitting on a couple of tiers you have the 50 or so prospective jurors sitting in the courtroom you have a handful of spectators crammed into one side of the courtroom with the 50s prospective jurors you have 12 jurors sitting in the jury box and then in the jury room you have all counsel for the government and the defendants and one prospective juror being questioned both for hardship and for cause oh and the last thing is over at Spring Street in the jury room in the jury assembly room there you had 200 or so prospective jurors who were connected by video feed as necessary could be turned on and off at that point I made my proposal to the court and it's a that's where I'd like to use this diagram as follows this is what I proposed all defendants be put in open court a very small number of people also in open court prospective jurors seated in the jury box put them in the jury room there's plenty of room in the jury room for 12 jurors the individual juror being questioned put that person in open court. Your Honor I would argue that the record shows that before that we got to the what about the 50 prospective jurors in the audience the court said it's not possible not feasible physically impossible we're not going to do that no questions so several weeks later when we had my argument for mistrial on behalf of Mr. Mesa the court expanded on the reasons for rejecting my proposal and at that time several weeks later he criticized my proposal is not feasible because I didn't account in my proposal for the 50 or so prospective jurors now significantly at that time the court did not make any mention of category number two the very small number of people who I proposed be allowed to sit in open court so the first question is who is that small category of people that were being referred to to the judge the court didn't ask and the record shows the discussion was closed at that time however and I would argue to the court it is clear from the record that in addition to the 50 plus prospective jurors there were also spectators in the courtroom and the record shows that the spectators crammed in the courtroom with the 50 jurors were family members and members of the press by process of elimination in picking a jury for a criminal case especially the one of this magnitude it's going to be very common that many many many prospective jurors would want to have a sidebar discussion with regard to cause issues and their concerns they're just not comfortable disclosing all of that in open court and can be much more candid with a sidebar discussion so I'm speculating from the what the judge said in the record here but he was concerned that he couldn't give the sidebar discussions to those jurors without going to a separate room so what's wrong with going to a separate room and and then telling counsel anytime you want to step out feel free to do that and I don't think anybody took him up on that offer actually your honor in our brief we argued that there's no evidence that we did not take the court up on on the offer to talk to our clients about what was proceeding behind closed doors but to but we would have had to violate the attorney-client privilege to correct the judge on that respect but the most important what's wrong with that procedure to say gosh logistically this is the only way I can think of to do a sidebar balancing all of the other concerns but whenever you want to talk to your client feel free to do that just let me know because two thirds of the voir dire in this case was done behind closed doors including virtually all of the cause all of it and not one single defendant was able to cooperate with his counsel in being able to comment during the preemptory position or even in making other arguments for cause as to local knowledge as to any of the any of the other aspects that which are the underpinnings of the right to be present during your trial in terms of assisting your counsel as to during the voir dire process but by process the point I'm in common sense it was clear that when I said this very small group I was referring to the family members a handful of family members in the press that were seated in the back and and the court in in the court that in denying that those people be present during the voir dire process he was just he was really defining that the public because those were the public for purposes of this trial that they could not be pressed and one point that you mentioned that I forgot to that you just raised I forgot to mention if you look at the record on a handful of occasions the judge said and when I say a handful I'm talking about maybe less than ten well sir would you like to talk in privately about the issues that you've raised on your questionnaire and most of the time in the vast majority the court never asked whether the the prospective juror wanted to talk in private or not in fact I think the second or third one after the judge had issued his questionnaire said you know before the judge said would you well we'll put you in chambers and the jury said no no I'm happy to talk about it now and after that happened for the remaining questionnaires for the remaining issues of cause the judge never asked again whether someone really wanted to go and I would suggest for fear that they would say no we don't want to go I'm happy to talk about it here and it would thwart the process that he'd set up. Now the second critical point that I want to raise in my time is the court will recall that I did not account for the 50 prospective jurors in the courtroom. The first question why didn't the court say in that when I made my proposal Mr. Randolph help me here what about these 50 people sitting here where are you going to put them if you've got the prospective jurors sitting in the jury box so that the defendants and the public can participate in an open trial. There was no discussion he just said we're not going to do it it's physically impossible and let me know if you have another way. Well I should have asked and I didn't whose job is it to protect the defendant's right to a fair trial. I respectfully suggest it starts with the court resources and the question arises didn't the judge realize that he had the authority to call upon those resources in this situation and the answer is an unequivocal he certainly did realize that and you need look no further in the record than the events of day two the previous day before my proposal of this record and I respectfully direct your attention to government excerpt of record set 11742 through 11745 that clearly establishes that the judge knew how to go about finding space for these 50 jurors when he needed to. What happened on day two? At 2.24 p.m. the court had prepared a proposed questionnaire and he wanted all the 50 jurors in the courtroom to fill it out but he also wanted to have continued proceedings without their presence. So where to put them? Not a problem. The judge in the record the judge did what you would expect him to do. He at 11743 government excerpt of record there's a discussion off the record with Judge Walter and the courtroom deputy and I'm quoting actually what we're going to do is we're going to move the jurors who are currently present in the courtroom hopefully across the hall unquote. Thereafter he says the delay is that we're attempting to find a courtroom on this floor that we can open and have the jurors go into that courtroom and fill out the questionnaires unquote and finally quote and after those individuals leave the other members of the panel who are in the audience Shannon will take you out in the hallway and distribute the questionnaires and we will find you a quiet place for you to fill out those questionnaires. The court's going to be in session. We will find you a quiet place. Now the record is totally silent thereafter that any problem was subsequently encountered in finding that quiet place for the 50 jurors. The court had good reason to be confident that at the drop of a hat on a moment's notice in the Roybal building he could find a quiet place for 50 jurors. Eight district courts, a number of magistrate courts, a jury assembly room, a large cafeteria, undoubtedly other locations in the building that would accommodate temporarily housing 50 people even in that building and that's why the court was so confident we will find you a quiet place. Well what's the take home lesson from all of this? When it comes to filling out a jury questionnaire with a short notice for 50 plus jurors the court does the logical thing, consults with the deputy, go find us a place. But when it comes to the defendant's and public's right to be present during two-thirds of the voir dire, the defendant's right to a public trial even when it could easily have been anticipated for weeks before this trial started the court says it's physically impossible and he puts the burden on defense counsel to come up with a solution. You have two minutes left. Thank you. Courts after the fact excuses for lack of facilities on the eighth floor are wanting and mostly what those excuses highlight is the real reason underlying this extraordinary deviation from proper trial proceedings. It was simply too inconvenient. It would have taken too much time to figure out where to put them during the seven days of voir dire and still preserve the public's right and the public's right to be present in their trial and to have a public presence. Thank you very much. I'll reserve my time. Good morning. On behalf of the court, I'd like to ask you to give me two minutes. Yes, on behalf of the  court, I've been asked to remind the court that Jose Mejia, co-defendant represented by Philip Trevino, he did not join in the Brady issue on behalf of his client and that we would respectfully request that if the court is going to deny that issue that it be without prejudice so that the individual can be heard if they so desire after the case is over. And as far as Manuel Yepes is concerned, he is clearly entitled to a new trial under Rivera Corona and the Brown case. Four months, five months before the trial started, he wrote a letter to the court stating that his retained counsel wanted another $200,000 to go to trial and that he was very concerned that he needed counsel to prepare for the trial and he was alerting the court well ahead of time. The court rejected that letter and we know that the court did see it. It's on PACER. It's still on PACER and the court signed the discrepancy notice saying that it was not to be filed. Mr. Yepes was entitled to appointed counsel under the CJA rules. I don't know that he saw that or if that was a stamp. I'm sorry, say that again. I don't know that the judge saw that or if that was a stamp signature where perhaps the courtroom deputy clerk returned it, but he had an opportunity some weeks later to appear before the court on May 9th with Mr. Estrada on a hearing on a motion to suppress the wiretap evidence. Did he attempt to raise it in any way in that case? No, not again until a little bit later. He wrote subsequent letters, but think about a defendant who has written this letter. He's incarcerated. Presumably what he received was this, if he did get it at all, this notice of discrepancy that appears to be signed by the judge, appears to be dated by the judge, and there's nothing there. What is he supposed to do? He's incarcerated and his lawyer had an obligation to bring this up. In these other cases in Brown and Rivera-Corona, where there was this dispute between the client and the lawyer regarding fees and so forth, the lawyer themselves told the judge that we're having this serious problem here. Didn't Mr. Estrada have an obligation to bring that up to the court because he knew that he and his client were having this enormous fee dispute? And in Rivera-Corona, for example, the court said, we're concerned that when you have these fee disputes like this, that a lawyer may feel that he's being obligated to try this case pro bono. I mean, in this case here, the discrepancy was between $65,000, which he had been paid, and $200,000 to go to trial. And no time during these proceedings when Mr. Estrada brought it up again and again, did Mr. Estrada dispute this fee agreement? So under these two cases, he is entitled to a new trial. Thank you. Does the court have any other questions? Thank you very much. All right. We'll give you five minutes for rebuttal. Total. Good morning again, Your Honors. May it please the court, Ashley All for the United States. The government takes Brady obligations very seriously, and I agree that defendants should have the opportunity to litigate this issue, but I submit to the court that the correct way for them to raise that now is in a 2255. Is there anything wrong with the procedure when the information comes to their attention during the course of the appeal? Is there anything wrong with our remanding it to the district court if we think there's a need for further information? Your Honor, I think at this point, there's nothing preserved on which to remand. I think as a matter of fact, it doesn't make much difference whether it's raised in a 2255 or in a limited remand. Well, counsel points out that on a 2255, there would be no counsel, and I think the incarcerated defendants would be disadvantaged because counsel's explored these issues. They've obtained the transcripts and the evidence and have submitted to the court of appeal. So I'm wondering what the available procedural vehicles are to kind of get to the bottom of this issue. Do you agree that the facts are rather murky? I would agree there are factual disputes that should be litigated, absolutely. I do dispute, however, that the defendants did not have an opportunity to raise this before. There is an established procedure that my office and even the defense counsel in this group have used in the past. Here, the defendants were already in front of the district court on limited remand when Horacio Yepp is testified. They were on limited remand from May 2009 until November of 2011, so for over two years after Horacio Yepp is testified. That limited remand was, of course, about sealed documents, but in prior cases, the procedure that my office has taken is the defendants ask the district court for leave to file a motion for a new trial, and if the court agrees, then they then move in this court for a limited remand for that to be considered at the time. So I do submit to the court that there has been a forfeiture of a procedure that was available, and what this court has done in even recent cases, I can submit a 28J if the court wants, is to deny the claim at this point without prejudice to a future 2255 motion. I also want to dispute some aspects of the record that came up. The facts are extremely vague, as you will notice indicate, but a few things that just came up in argument were that Victor Bulgarian was characterized as a good citizen who came forward. That is false. At G.E.R. 3459, he was cross-examined by counsel for Rafael Yeppes, who pointed out specifically that he did not come forward to law enforcement, that law enforcement had to come to him. Similarly, he did not say that there is no evidence that he was working as a paid informant in this case at all. He got a $5,000 relocation payment, and as we laid out in the opposition to the motion for judicial notice, we have found no other evidence that he was paid anything in connection with this case. As to prejudice, which I think part of the problem with limited remand in this case is that there is no way for the court to find plain error under the court's definition. In his later trial, he said he was a professional paid informant. All he had to do to get money was to call one of these agencies, and then he'd go to work, and they'd let him do it because that was basically his profession, and he earned a tremendous amount of money as a professional paid informant. So whether he came forward, they came to him, it seems that the picture that's painted is a totally different picture than it was painted at trial. I think it's a totally different picture as to degree but not character. I'm aware of these court's prior cases where... Counsel, let me say the amount of money is quite important. The difference between 5,000 and 800,000 is enormous. What disputed facts, what is the government disputing now? Are they disputing that he got all that money? Yes. What is the government position? So in our declaration in support to the opposition for judicial notice, we absolutely dispute that he received any payments of the magnitude that is discussed in the Horatio Yepez trial. In the declaration, we've laid out that we discovered evidence of a $5,000 relocation payment, two $200 payments from the ATF, and $60 from the San Bernardino Police Department. We've also laid out that we were unable to obtain records from the ATF. So the government position is basically a total liar. No, Your Honor. I think the testimony is messy. Well, it's messy, but I read that testimony in the second trial. He said he could get paid whenever he wanted. First he said $80,000, and then he said, well, it was over $100,000, and he didn't know how much over $100,000. And you're saying that's all untrue. No, Your Honor. I'm sorry. We're talking about what was true at the time of the 2006 trial, and I've just laid out what we knew in 2006. I think there are those two $200 payments from the ATF and the $60 from the San Bernardino Police Department, but based on our investigation thus far, we are aware of no evidence that he was at that time a professional informant, as the court is saying. That certainly was true by 2009 when he testified in the other trial. So what the government is saying is that at the time that he testified in this trial in 2006, you turned over all of the evidence that you had with regard to payments, and even reconstructing the evidence for purposes of this appeal, there was nothing more than what the government had already disclosed. And so the payments and his work as an informant were apparently subsequent to his testimony in the 2006 trial. Is that what the government is representing? No. The government did disclose all payments made in connection with this case. The only payment that was made in connection with this case was the $5,000 relocation payment that was not of the magnitude discussed. Oh, I see. In reconstructing it for purposes of the trial, you found out that there were a few payments made that were not disclosed to counsel that should have been disclosed. Yes, Your Honor. But if you are utilizing the time of the trial, which is 2006, and then going back from that, it was a few hundred dollars. There was an additional relocation payment, and then the few hundred dollars from the ATF and the San Bernardino Police Department. And this is why we have absolutely no dispute that there needs to be further litigation of this issue. In a 2255, we are not going to be asserting any procedural default in order to avoid litigating this issue, and I think it's important that it be litigated. But it is not appropriate to be litigating these disputed facts in motions for additional notice on appeal. To the extent that defendants keep asserting that they believe Victor Bulgarian was paid $80,000 in 2006, that fact is not subject to additional notice, and I would submit it's also not true. And this Court, whether or not the defendants had an opportunity to raise this before, this Court does not sit as an initial fact finder in cases where something was not raised below. So the government is saying it's got to be hashed out, it's got to be hashed out below. You think that it should be an affirmance without prejudice so that defendants can raise it by way of a 2255. The other option to do it is a limited remand for an evidentiary hearing of some sort. What would be wrong with that second alternative? Your Honor, it's only wrong insofar as it's not what this Court has done in the past. And I think as a matter of practice, this Court does not remand absent a finding of error. There's no error to be found here on this record. In another recent case, this Court has done exactly what the government has asserted should be done, which is denied relief in this case without prejudice, though I think it would always be done. But there's conceded error because the government just told us that in reconstructing the records for purposes of this appeal, there were some payments that should have been disclosed that weren't disclosed. Now the question is, the extent of it seems to be heavily in dispute. Isn't that enough for limited remand? Your Honor, I would just admit that in the Rodriguez case, which I'll submit a letter to the Court with a citation to it, there was a similar discovery of post-trial, post-notice of appeal, undisclosed Brady information, and the Court affirmed without prejudice to a 2255. All right, so say it did it. Does that mean that's the only way to do it? No, Your Honor. Again, I think this is a dispute just about procedure, and I think strong feelings about procedure are rare in contexts like this where there's not a dispute that there should be evidentiary development. I would assert, however, that I think the request for a limited remand in part is hinged upon the proposition that the defendants didn't have an opportunity to do this before, and that's just not right. They did have an opportunity to raise this before. We could have been arguing after that limited remand now, and they didn't do it, and so I think at this point the proper procedure is not to order a limited remand, but to require them to file a 2255. Moving on to briefly on Manuel Yepes' claims, I have a legal point and then a factual point. The legal point is I think both Manuel Yepes and Rafael Yepes have misrepresented the legal standards in their reply briefs. Rivera-Corona and Brown both explicitly deal with situations where there are no interests inherent in the fair administration of justice or no continuances to be balanced against a defendant's Sixth Amendment rights. In Rivera-Corona, the court specifically held that a different analysis applies in those cases, and in those cases a different analysis is exactly what the court is supposed to do. The court so held in Torres-Rodriguez, which is cited in Rivera-Corona, where the Mills factors were applied. In fact, in the Demore case we cited, this court faulted the district court for not looking into extensive conflict on a similar factual scenario, and the court also did that in Nguyen and Miller. As to the facts, the linchpin of Manuel Yepes' claim is this April letter, and as the court noted, that letter was not received by the court. It was balanced in accordance with the local rules. What happened to the letter? The letter was not filed by the court. We have the cover letter to it. It was returned to counsel, according to the cover letter, and the docket entry indicates that it was rejected because it violated the rule against represented parties contacting the court. After that, as Your Honor stated, Manuel Yepes and his counsel did nothing. They appeared in front of the court for a hearing on May 9th and said nothing. For four months they did nothing, and again, I think it's important that both Manuel Yepes and his counsel, at least by the time of trial... It was done in May, right? The letter was in April. The hearing that they both attended was in May, and then the subsequent letters were in late July, with a then very looming trial date in early August. But nothing was done for four months? Nothing was done for four months. Which four months? From April until... It's a little bit less. It's from April until the end of July. So from early April until July 25th, I believe, is the date that the court sent a Marston hearing. That's right. Right? So he didn't handle that July letter in the same fashion as he handled the April letter. That's right. So I don't know... I don't think the rules are being consistently applied, and I don't think all the judges handle letters from represented defendants asking for Marston hearings in the same way, frankly. Shouldn't the court have scheduled a hearing to take up the April letter as well? We have... We can only hypothesize why those letters were dealt differently. And I would note to the court that if the reason matters, the court should remand for the district court to say... I don't know that the reasons really matter. I just... You know, you've got a defendant who is facing very serious consequences, writing a letter to the judge some months before trial saying that he would like to have appointed counsel. Mr. Strada was retained, right? That's correct. And he's saying that my family can't come up with the $200,000 to pay him through trial, and so I fear that he's losing interest and not working towards an adequate representation. Give me retained counsel, and I don't want to wait until the last minute. He says this in the letter. I don't want to wait until the eve of trial. And so the court kicks that, and then finally the court takes it up when he himself renews the request in July, and by that time the court says, well, you've raised it on the eve of trial, so it's untimely. There's something not right about that scenario, right? We're all left with the same record from which we can try to make inferences. There is a difference in character between that earlier letter and the later letters. And again, I don't want to hypothesize unnecessarily, but the earlier letter only indicates he's having a fee dispute. Though he asks for appointed counsel, he does not actually ask to fire Mr. Strada out of being dissatisfied with his representation, which is what he says explicitly in the later letters. He indicates that he is having trouble paying for him and asks for appointed counsel. And Rivera-Corona and in this case, and again, this is the best I can do to distinguish that letter from the later letters, it did indicate only that he was having trouble affording him. I do not believe he actually expressed any substantive disagreement with him at the time. And then later, not only does he not mention anything for four months, there's no request for substitution filed, counsel doesn't raise anything, four months later the complaints have changed. It's a totally different set of all. And so four months later, at a time when the district court found that he was malingering and strategically trying to delay the trial, that earlier dispute is off the record. And so I would just suggest to the court that the district court did not abuse its discretion in refusing to file that initial letter, that to the extent there were any Sixth Amendment claims that would have attached that time, they were waived by not re-raising them when there was ample opportunity to The district court followed the proper procedure under Rivera-Corona and Brown, found that there was not a grounds for substitution at that time on the eve of trial, and proceeded correctly. And so Manuel Yepez's conviction should also be affirmed. Finally, dealing with the issue regarding jury selection. Look, we've laid out the facts, I think, as best we can. It's very difficult to reconstruct how jury selection happened outside of the presence of the public and the defendants. We've tried to be much more specific in our outlining of the facts. With regards to what was raised today, the court did specifically address the proposal that was made by counsel for Mr. Meza and found that it was physically impossible at the time, which is at GER 11798, and later in the findings on the motion for a mistrial at GER 1195-96 went into detail as to why it was physically impossible. There was never another proposal made that was physically possible. And I think the problem that is being overlooked in this sort of re-characterization of the facts now is that that proposal left no way for a juror to have a true sidebar that could not be heard by the members of the public. And the reason the public could not be shuttled in and out is because they had to be screened coming into the courtroom. There were two metal detectors outside of Roybal and a secondary metal detector right outside the courtroom. And so when the court found that it wasn't feasible to screen jurors coming back and forth, it literally meant because you had to run everyone through a metal detector on their way back in. The court's findings are not clearly erroneous. The court dealt with this issue in detail. And as a legal matter, I would just say, again, we've gone through the applicable law at length. The easy way to resolve it is to find any violation harmless. As we noted in this court in Reyes and all of the cases cited by Reyes, all find Rule 43 violations harmless on similar facts. I think particularly here where the court was dealing with astoundingly difficult issues of security related to witnesses that had been murdered, cooperators that had been murdered and intimidated, activity like that that continued during this trial. So the set of the procedures that the court adopted were extremely reasonable and did their best to balance the defendant's interests. If the court has any further questions, I'd be happy to address them. There are a couple of defendants who raised sentencing issues. I believe Mr. Manuel Yepes did and Mr. Jose Mejia as well with regard to sentencing amendments that may apply to them. Does the government want to take a couple of minutes to address those? Your Honor, I don't think it will take a couple of minutes. I think they need to file motions under 3582C, which is what other defendants in this case have done. The district court has been actively considering those motions. I believe at this point one has been granted, one has been denied. As we laid out with respect to the Mejia brother, the reason they can't be decided now is because there are factual issues that the court has to revisit. In the case of Mr. Mejia, it may be that his sentence remains the same because the quantity of drugs that he was found to have trafficked in would still be sufficient to support his guidelines level. That may or may not be true with regard to Manuel Yepes also. In any case, this court should for now deny their claims without prejudice to them raising them before the district court in a 3582C motion. If the court has no further questions, I would submit. Thank you, counsel. Thank you very much. I just have three quick points to make. The first is in response to the government's argument that we should have filed a motion for a new trial under Rule 33B. Rule 33B says that in the case of newly discovered evidence, which is what the government is saying this was, that we have three years from the verdict. We were outside of that time frame. We couldn't have done that procedure, which the government is correct, is something that is at times done when you're within that three-year period. But we were already outside of it by the end of 2009. In fact, we didn't get the transcripts on it until 2010. The second point is that the government has been saying that Bulgarian was not paid in connection with this case. What we're saying is that Victor Bulgarian was being paid in connection with a lot of cases by a lot of different agencies, and all of that needed to be turned over. It doesn't matter that he wasn't being paid in connection with this case before 2006. The point is that he was working as a paid informant. This really is a question of extent as opposed to whether he was working as a paid informant. Finally, just to make the point, the position that he had the expectation that he was going to be paid for his testimony, which is what he said in 2009, that he had been paid for his testimony. There was certainly a tacit agreement that if you deliver for us this time, there's going to be more work for you. Indeed, there was. Thank you. The court excluded the jurors, I mean the defendants and the public from virtually the vast majority of the voir dire on the issue of cause. The right to a public trial is a structural defect, and no prejudice is required. The defendants and the public were excluded from all of this. It was not an insignificant amount. On the issue of cause, the judge, and I cite the court to GER 1998 where the court said, well, yes, I was concerned and I believe that the jurors are more candid in expressing their feelings and beliefs and prejudice about getting behind closed door. The problem with that is twofold. First and foremost, that reasoning directly conflicts with Rule 43 and the second practical reason is the defendants are entitled to participate. They need to see how the jurors and the counsel as well, how the jurors react to their fear of gangs in the presence of the defendants, which is where they will be for the ensuing weeks as they sit in judgment on these very same defendants. We need to see them when they're facing the defendants and express their concerns about gangs. That was what was excluded from the defendants and the public. So there is a distinguishment between personal embarrassment, where there were a handful of those, and people that talked about cause and with the vast majority of the issues for cause about their concern about the Vineland Boys, about the gangs in the Burbank area. Those were the issues where we needed, under Camacho, we needed the special knowledge of our clients to be able to look at these people and participate in the voir dire process. Can you imagine in the preemptory section when I talk to my client and say, Mr. Mesa, we've got preemptories. What do you think about juror number seven? I don't know, Mr. Randolph. What do you think? Tell me what he said. Well, here's what he said. Well, how did he say it? What words did he use? What was his demeanor? Well, I'll explain it to you the best that I can. That participation in the voir dire process was taken away from the defendants in this case, and for no good reason, because of convenience. Convenience that could have easily been worked out. Counsel said, how can we put them through two security measures? Well, first, one of the security measures was coming into the courthouse. As this court knows, the Roybal building was a big building. Surely, they could have found a quiet place for these 50 jurors during the jury select, the few days of jury selection process. As inconvenient as it would have been, they could have found that place for those few days and preserved their right to be present and to a jury trial. So, convenience falls by the wayside when it comes to those important rights. I really thank you for your time. Thank you, counsel. Thank you all very much.
judges: Reinhardt, Noonan, Nguyen